[No. 5085.    Decided March 22, 1905.]

JOHN KROEGER, *Respondent*, v. THE SEATTLE ELECTRIC
COMPANY, *Appellant*.[1]

CARRIERS—PASSENGER ENTERING CAR BARN—IMPROPER PLACE TO
TAKE CAR—NEGLIGENCE—FAULTY CONSTRUCTION OF BARN. A street
railway company is not a common carrier as to cars housed in its
car barn over night for the purpose of repairs and cleaning,
although four to six people on an average entered the barn every
morning between the hours of 5 and 6 A. M., for their own con-
venience, without invitation, for the purpose of waiting for and
taking the first car to distant points; and hence is not liable to
passengers for injuries resulting from the faulty construction of
the barn, there being nothing in the place to mislead or induce
one to believe that it was a proper place to take a car, and all
the surroundings indicating the purpose for which the barn was
constructed and used.

SAME—CONTRIBUTORY NEGLIGENCE OF PASSENGER—ENDEAVOR TO
ENTER CAR AT IMPROPER PLACE. Where a passenger enters a car
barn at an unusual and dangerous place to enter a car, and, after
the signal to start the car is given, undertakes to enter the front
entrance of the car when it is only three or four feet from the
barn door, in a passage way so narrow that he would inevitably
be caught and crushed between the car and door unless he suc-
ceeded in making the entrance before it reached the door, and
where he had better opportunity than any one else of observing
the dangers, he is, as a matter of law, guilty of contributory neg-
ligence which was the proximate cause of his injury, and it is
error to fail to so instruct the jury.

Appeal from a judgment of the superior court for King
county, Albertson, J., entered October 23, 1903, upon the
verdict of a jury rendered in favor of the plaintiff, in an
action for personal injuries sustained by a passenger in
attempting to enter a street car.    Reversed.

*Hughes, McMicken, Dovell & Ramsey,* for appellant.

*Morris & Southard* and *Benson & Hall,* for respondent.

[1]Reported in 79 Pac. 1115.

PER CURIAM.—For some time prior to the 18th day of April, 1902, the defendant was engaged in operating a street railway system in the city of Seattle and vicinity. In connection with its railway system, the defendant maintained a car barn at the corner of Fifth avenue and Pine street, which was used for the purpose of housing, cleaning and repairing its cars during the night, when not in service. The middle or new barn, where the accident which gave rise to this controversy happened, is sixty feet wide and one hundred eighty feet deep, facing on Fifth avenue. There were five tracks running from Fifth avenue into this barn, and extending substantially its entire length. For a distance of about eight feet from the side walk on Fifth avenue the floor of the barn was on a level with the sidewalk. From this point, about eight feet back of the street line, to a point 122 feet back from the street line, the cement floor of the barn was constructed about four feet below the threshold of the barn and the street level. Trestles were constructed across this space, which supported the tracks, thus leaving open pits below, so that the running gear and dynamos of the cars might be inspected and repaired from beneath the cars. Between the tracks, extending through the barn, plank walks were laid, to enable the barn men to pass between the tracks from car to car, with sand and other supplies, and to facilitate the work of inspection and repair. In the rear of the barn, and back of the pits above described, the floor again rose to the level of the tracks, and here were maintained derricks and other heavy machinery used in lifting the cars, when trucks or dynamos were in need of repair.

From fifteen to twenty-five cars were usually housed in this barn each night. These cars were shifted about from time to time during the night and in the early morning hours, for the purpose of repairs, and also for the purpose of placing in the front of the barn the cars first due to leave in the morning. There was a "No admittance"

35-37 WASH.

sign on one of the trusses above the tracks in the barn, and the employees were instructed not to receive or discharge passengers in the barn. This rule was not strictly enforced, as will hereafter appear. At the front of the barn were cast-iron columns, on each side of the several tracks, to support the brick work in the front part of the building. Doors, attached to each of these columns and to the side walls of the building, opened and closed over the tracks. These doors were nearly always open, except in case of emergency. The iron columns to which the doors were hung were less than eleven feet apart, and did not leave sufficient space for a person to pass in safety between a car and the door.

The first regular car to leave this barn in the morning was the car for Green Lake, which left the barn at 5:15 A. M. For some considerable time prior to the 18th day of April, 1902, a number of persons were in the habit of going to this barn, for the purpose of taking this first car to Green Lake and other points distant from the city. From the testimony it would seem that from four to six persons, on an average, took the first Green Lake car every morning. A majority of these were police officers, who went off duty at 4:00 o'clock in the morning, and took this first car to reach their homes. The few civilians who took the car were usually persons employed on the city streets or elsewhere during the night, and took the car for the same purpose. These people would reach the car barn some time before the car was due to leave, and would enter the barn and take their seats in the car there to rest, read the paper, or sleep, as they saw fit. So far as the testimony discloses, no person, other than employees, was invited into the barn, and none of the above mentioned persons were forbidden to enter it. The employees of the company were about the barn in the discharge of their duties, cleaning, inspecting, and repairing the cars, and would sometimes, upon inquiry, direct persons entering the barn

which car to take to reach a given destination. Nearly all the persons who were witnesses at the trial testified that they entered the barn and took the car there for their own convenience, rather than wait for the car to come from the barn.

The plaintiff in this action was employed on the city streets during the night of the 17th day of April, 1902, and for some time prior to that date. He quit work at 5:00 o'clock on the morning of the 18th, and went to this car barn, to take the first Green Lake car to his home at Fremont, as he had done perhaps a dozen times before. When he reached the car barn on the morning in question, the Green Lake car was standing on the track, almost ready to start, the front of the car being about even with the front of the barn, leaving the entrance at the front of the car not to exceed from two to four feet distant from the barn door. When all was in readiness, the motorman and conductor gave the usual signals to start, the car moved forward, the plaintiff attempted to enter through the front door or entrance of the car, and was caught and crushed between the car and the barn door. While there is some slight conflict in the testimony on minor points, and some testimony of a negative character inconsistent with the above statement, the foregoing facts are so clearly established by the testimony as to leave no question of fact for a jury to pass upon. The plaintiff brought this action to recover damages for the injuries thus received, and from a judgment in his favor this appeal is taken.

Two grounds of negligence are alleged in the complaint: First, negligence in the construction and maintenance of the car barn; and second, negligence in the operation of the car by which the respondent was injured. The answer is, in effect, a general denial, and a plea of contributory negligence.

The car barn in question was constructed and maintained for the sole purpose of housing, inspecting, cleaning, and repairing the cars of the appellant company, and the plan of construction in no manner affected or concerned passengers or prospective passengers, so long as the barn was used for the private purposes for which it was built. We cannot think that the limited use made of this barn by the few persons mentioned, at the times and under the circumstances stated, had the effect to transform this place from a car barn and work shop into a passenger station or depot. There was nothing about the place to mislead one, or to induce one to believe that the barn was a proper place for passengers to enter cars for rest or for sleep. When a majority of those persons entered the barn to take the car, the car was standing on trestles, over a pit, without a crew, and it would be going entirely too far to hold that the appellant was a common carrier of passengers in relation to a car so situate. All persons who entered this barn to take cars did so between the hours of 5:00 and 6:00 o'clock in the morning. They adopted this practice for their own comfort and convenience. All their surroundings indicated to them, clearly and fully, the purpose for which the barn was constructed and used, and the dangers incident to taking the cars at that place. Considering all these facts, and more especially the class of persons who thus entered the barn in violation of the rules of the company, even conceding such rules to have been unknown to them, we have no hesitancy in saying that the appellant was not a common carrier of passengers in this barn, and was not responsible for injuries resulting to passengers from faulty construction of the barn.

Were the employees in charge of the car negligent in its operation, and was the respondent guilty of contributory negligence? Ordinarily these are questions of fact for a jury, but when honest minds cease to differ upon the facts

of a given case, or as to the conclusions to be drawn there-from, the verdict of a jury must give way. It cannot avail the respondent to say that he did not hear the customary warning that the car was about to start. The warning was unquestionably given, and he was either engaged in con-versation—as claimed and as testified to by one of his own witnesses—or for other cause, for which he alone is respon-sible, did not hear it. The respondent attempted to enter the car in a dangerous, unusual place, after the usual sig-nals for the forward movement of the car had been given. He attempted to make the entry through a door or entrance which was not to exceed three or four feet from the barn door. He would necessarily and inevitably be caught and crushed unless he succeeded in making the entrance before the car reached the door. All these dangers were open and apparent to him. He had a better opportunity to observe and avoid the dangers than any other person. He was either negligent in not discovering or observing the danger, or he was reckless in his attempt to avoid it, and there seems no room to doubt, as a matter of law, that he was guilty of contributory negligence, and that such negligence was the direct and proximate cause of his unfortunate ac-cident. The court should have so instructed the jury. We think it did so charge in effect, but the instruction should have been peremptory.

For this error, the judgment is reversed, with directions to dismiss the action.